**\*\*NOT FOR PUBLICATION\*\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                          :
LMT MERCER GROUP, INC.,                   :
                                          :          Civ. Nos. 10-4615, 10-6699 (FLW)
                      Plaintiff,          :
                                          :
        v.                                :          **OPINION**
                                          :
MAINE ORNAMENTAL, LLC. *et al.*,          :
                                          :
                      Defendants.         :
_____:

   In this claim construction Opinion, the Court construes a patent for a "fence post accessory apparatus." After reviewing the parties' briefing and exhibits, and holding a *Markman* hearing, the Court adopts certain of the parties' proposed constructions and construes other claim terms in accordance with the intrinsic and extrinsic evidence. Accordingly, the Court construes the claims as set forth herein.

## I.  BACKGROUND

   The patent that is the subject of this claim construction dispute, U.S. Patent No. 6,722,637 (the "'637 Patent"), was originally filed by Patentees Michael Burkhart and Jeffery Herion on October 10, 2001, and later was assigned first to Stallion Fence Accessories, Denver, Colorado, and presently to LMT. The '637 Patent claims a fence post apparatus for synthetic fence posts, and more specifically, an apparatus to be attached to the top end of a synthetic fence post that may include a light emanating device. When the patent was filed, the prior art consisted of other apparatuses for placing a lamp on the top of a stake or post. As the '637

Patent abstract details, the claimed apparatus was intended to avoid the problem of structural degradation caused by attaching accessories to the top of synthetic fence posts. The '637 Patent sought to solve this problem by generally avoiding the necessary use of screws or other fasteners, relying instead on mountings that allow the apparatus to engage with the fence post in a secure manner. The nature of this feature claimed by the '637 Patent is one of the principal disputes in this *Markman* proceeding. Additionally, the '637 apparatus claims a structure that allows for light to be emitted from within the apparatus through "light emanating sidewalls." The parties dispute this structure—specifically the sidewalls' coatings or physical variations—claimed by the '637 Patent. This is the second principal dispute. Overall, the parties focus on 10 disputed claim terms or phrases requiring construction.

The patentees were awarded their patent on April, 20, 2004, with the patent now held by LMT. Claiming infringement upon the patent, LMT filed suit against Defendant Maine Ornamental ("Maine") in September 2010, *see* Civ. No. 10-4615(FLW), Defendant Home Tops ("Home Tops") in December 2010, *see* Civ. No. 10-6699(FLW), and Defendant McFarland in January 2011 (McFarland). *See* Civ. No. 10-0539(FLW). Before any meaningful motion practice or discovery, Maine Ornamental initiated *ex parte* reexamination proceedings of the '637 Patent before the United States Patent and Trademark Office ("USPTO") on March 9, 2011. Pending reexamination, LMT's infringement suits were stayed as to each of the three Defendants. On August 28, 2012, the USPTO issued a reexamination certificate, on September 25, 2012, the stays were lifted, and on December 7, 2012, the three LMT actions against Maine, Home Tops, and McFarland were consolidated for pretrial purposes, including claim construction. On October 11, 2013, a Stipulation and Order of Dismissal with Prejudice was entered for LMT's claims against McFarland. *See* Civ. No. 11-0539(FLW), Dkt. No. 42.

Maine and Home Tops (collectively, "Defendants") have filed their *Markman* briefs, and the Court held a *Markman* hearing on November 19, 2013, wherein it indicated that this written Opinion would follow.[1]

## II. LEGAL STANDARDS

Claims define the scope of the inventor's right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Claim construction determines the correct claim scope, and is a determination exclusively for the court as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978-79 (Fed. Cir. 1995) (en banc). Indeed, the court can only interpret claims, and "can neither broaden nor narrow the claims to give the patentee something different than what he has set forth" in the specification. *E.I. Du Pont de Nemours v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

This interpretive analysis begins with the language of the claims, which is to be read and understood as it would be by a person of ordinary skill in the art. *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001); *see also Markman*, 52 F.3d at 986 ("[T]he focus [in construing disputed terms in claim language] is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean."); *Phillips*, 415 F.3d at 1312-13. In construing the claims, the court may examine both intrinsic evidence (*e.g.*, the patent, its claims, the specification and prosecution history) and extrinsic evidence (*e.g.*, expert reports, testimony and anything else). *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). However, claims may not be construed with reference to the accused device, which means that the court may not, for example,

---

[1]    McFarland and Home Tops have also filed motions for partial summary judgment, which I dispose of in a separate Opinion.

construe a claim to fit the dimensions of the accused device, thus to prejudice the claim construction by "exclud[ing] or includ[ing] specific features of the accused product." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330 (Fed. Cir. 2006).

In interpreting the disputed terms, it is well settled that the Court should look first to the intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Phillips*, 415 F.3d at 1313-14. Generally, words in patent claims are given their "ordinary and accustomed meaning as understood by one of ordinary skill in the art" at the priority date of the patent application. *Dow Chem.*, 257 F.3d at 1372; *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999). The claims must be construed objectively in the context of both the particular claim and the entire patent because "the claims themselves provide substantial guidance as to the meaning of particular claim terms," and claim terms are normally used consistently throughout the patent. *Phillips*, 415 F.3d at 1313-14.

In that regard, courts are instructed to look to the specification, which is a written description of the invention. "[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). Indeed, the specification is perhaps the single best guide to the meaning of a claim term due to its statutory requirements of being in "full, clear, concise, and exact terms." *Id.* at 1316; *see* 35 U.S.C. § 112. "The specification acts as a dictionary when it expressly" or implicitly defines terms used in the claims. *Phillips*, 415 F.3d at 1321. Thus, it effectively limits the scope of the claim. *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006). Due to its nature, "the specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive.'" *Id.* (quoting *Vitronics Corp.*, 90 F.3d at 1582).

Extrinsic evidence includes all evidence external to the patent and prosecution history, *i.e.*, expert and inventor testimonies, dictionaries, and learned treaties. *Markman*, 52 F.3d at 980. It is considered only where the intrinsic evidence does not provide a sufficient description to resolve ambiguities in the scope of the claim. *See Vitronics*, 90 F.3d at 1583; *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). However, the Federal Circuit cautioned, in *Phillips*, that dictionary definitions should not be used to interpret patent claim terms in a manner that is divorced from the context and description of the invention in the specification. *Phillips*, 415 F.3d at 1321. The *Phillips* court reasoned that because of the nature of the patent claims, the dictionary definitions, as extrinsic evidence, are usually less reliable than the patent documents themselves in establishing the ordinary meaning of a claim term. *Id.* at 1314; *Toro Co. v. White Consol. Indus.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999). Ultimately, extrinsic evidence cannot be used to vary or contradict claim terms when their meanings are discernible from intrinsic evidence. *C. R. Bird, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004).

Overall, in construing the claims, "[t]he judge's task is not to decide which of the adversaries is correct. Instead, the judge must independently assess the claims, the specification, and if necessary the prosecution history, and relevant extrinsic evidence, and declare the meaning of the claims." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1556 (Fed. Cir. 1995); *MEMS Technology Berhad v. International Trade Com'n*, 447 Fed. App'x 142, 153 (Fed. Cir. 2011) (same).

## III.    DISCUSSION

### A.  Reexamination History and Prior Art

Before turning to the specific terms to be construed, I address the significance of the USPTO's *ex parte* reexamination of the '637 Patent, primarily because several of Defendants' construction arguments are based on statements and revisions made during the reexamination process.

After the USPTO approved the '637 Patent and after LMT filed infringement lawsuits based on the patent, Maine filed a request with the USPTO for *ex parte* reexamination of the '637 Patent.   In its reexamination request, Maine argued, *inter alia*, that the independent claims of the '637 Patent were anticipated by the prior art teachings of U.S. Patent No. 5,367,442 to Frost *et al.* ("Frost") and U.S. Patent No. 5,453,729 to Chu *et al.* ("Chu"), which were not previously considered in the original patent examination.   According to Maine, Frost claims a self-contained solar lamp and, in certain of the embodiments, identified the solar lamp on top of a post that could be inserted into the ground by stake, with the lamp contained inside a housing that has clear walls with apparent variations in the walls that could serve to diffuse or disperse the light.   *See* Dkt. No. 32-2, at 32 (Maine's Request for *Ex Parte* Reexamination, March 9, 2011).[2]   Maine further explained that Chu claims a "solar warning light" with a light-emitting source enclosed in a transparent cylindrical casing that engages with a "fixing device" though a threaded means.   *See id.* at 33.   It was Maine's contention that both of these prior art patents anticipated the claims of the '637 Patent.

---

[2]    The Maine Request for *Ex Parte* Reexamination is attached as Exhibit 3 to the Declaration of Melanie A. Miller filed in support of Defendants' Joint Renewed Motion to Stay Pending *Ex Parte* Reexamination of the Patent in Suit.

The UPSTO granted *ex parte* reexamination on the basis that a substantial new question of patentability was raised with respect to: independent Claims 1 and 15 under the prior art of Frost, and independent Claims 1 and 15 under the prior art of Chu. Specifically, the USPTO reasoned that under the '637 Patent requirements of "a light diffusing means for dispersing light emanating from within the hollow body" in Claim 1, and of a "single piece connector member" and "light diffusing means" in Claim 15: (1) Frost, taken alone, raised a substantial new question of patentability because "Frost teaches the use of a lens . . . which could be considered a light diffusing means and a single piece connector member," and (2) Chu, taken alone, raised a substantial new question of patentability because "Chu teaches the use of a light reflecting lines . . . which could be considered a light diffusing means and a single connector member." Dkt. No. 32-2, at 61-63 (USPTO Reexamination Order, March 29, 2011).[3]

During the reexamination proceeding, LMT agreed to amend the independent claims in the '637 Patent—Claims 1 and 15—by canceling certain dependent claims and integrating those claims into the appropriate independent claim; LMT also amended dependent Claim 11 into an independent claim. These changes did not otherwise alter the scope of the claims. Also during the reexamination proceeding, LMT agreed to amend the specification and independent claims to reflect that the claimed invention is "axially slidably engaged" with the connector member, as opposed to merely slidably engaged or axially engaged. *See* LMT *Markman* Reply, 10-11 (citing LMT's Jan. 30, 2012 Supplemental Reply to USPTO regarding Reexamination). LMT otherwise distinguished the '637 Patent from Frost by stating that Frost required a screw to engage the top piece to the connecting piece, whereas the '637 Patent's limitation that the

---

[3]     The USPTO Reexamination Order is attached as Exhibit 6 to the Declaration of Melanie A. Miller filed in support of Defendants' Joint Renewed Motion to Stay Pending *Ex Parte* Reexamination of the Patent in Suit.

connector member "be dimensioned to provide resistance to removal" obviated the need for such a screw.   *Id.*

Based on these amendments, on August 28, 2012, the USTPO issued an *ex parte* reexamination certificate for the '637 Patent.   Claim 1 was amended to include the following italicized language not included in the prior version:

1. A fence post apparatus comprising:

a fence post; a connector member for placement on a top end of said fence post *and* comprising a hollow body with a top end and a bottom end, wherein the hollow body includes sidewalls extending between said top and bottom ends to define an enclosed space, and where said sidewalls permit the passage of light therethrough and include a light diffusing means for dispersing light emanating from within the hollow body;

a top member having a first end for engaging said top end of the hollow body of said connector member*; a first engaging means provided at said top end of said hollow body for engaging said top member; and second engaging means provided at said bottom end of said hollow body for engaging a top end of said fence post, wherein said first engaging means and said second engaging means are axially slidably engaging with said top member and a top end of said fence post respectively, said second engaging means is dimensioned to provide resistance to removal, and at least one of said first and second engaging means comprises multiple tabs, and wherein said tabs are receivable within a corresponding one of said top member and a top end of said fence post*.

'637 Patent Reexam. Cert., Col. 1, lines 27-51.   Claim 11 was amended to include the following italicized language not included in the prior version:

11. *A fence post apparatus comprising:*

*a fence post;*

*a connector member for placement on the top end of said fence post and comprising a hollow body with a top end and a bottom end, wherein the hollow body includes sidewalls extending between said top and bottom ends to define an enclosed space, and wherein said sidewalls permit the passage of light therethrough and include a light diffusing means for dispersing light emanating from within the hollow body; engaging means provided at said bottom end of said hollow body for axially slidably engaging the top end of said fence post and*

*dimensioned to provide resistance to removal; a top member having a first end for engaging said top end of the hollow body of said connector member;*

a solar collector;

an energy storage device electrically interconnected to the solar collector; and

a light positioned within said connector member and electrically connected to the energy storage device.

*Id.* at Col. 1, lines 57-58 to Col. 2., lines 1-20. Claim 15 was amended to include the following italicized language not included in the prior version:

15. A fence post assembly comprising:

a fence post;

a single piece connector member for placement on an end of said fence post and comprising:

a hollow body with a top end a bottom end, wherein said hollow body extends between said top and bottom ends to define an enclosed space and permits the passage of light therethrough, *wherein sidewalls of the hollow body comprise light diffusing means for dispersing light emanating from within said hollow body*;

first engaging means provided at said top end of said hollow body;

second engaging means provided at said bottom end of said hollow body for *axially slidably* engaging a top end of said fence post *and dimensioned to provide resistance to removal*; and

a top member adapted to engage said first engaging means of said connector member, *wherein said top member comprises a light supportably positioned within said hollow body*.

*Id.* at Col. 2, lines 21-42. After the USPTO issued the reexamination certificate, this Court lifted the stay on the instant patent infringement litigation. It is from these amended claims, as well as other claim terms, that I construe the claims of the '637 Patent following the parties' briefing and oral argument on claim construction.

**B.  Preferred Embodiment Relevance**

Before turning to the specific terms to be construed, I address an overarching dispute between the parties: the relevance of the preferred embodiments set forth in the '637 Patent to the instant claim construction.

Defendants largely rely on the preferred embodiments of the '637 Patent to set forth the basis for their proposed constructions of the disputed claim terms—for example, and as explained in more detail *infra*, that the proper construction of the light diffusing means for dispersing light is limited to the specific examples in the preferred embodiments, or that the first engaging means is a continuous sidewall and the second engaging means is a plurality of downward facing tabs, both of which are identified in the preferred embodiments.  LMT, conversely, argues that it is inappropriate to import such restrictions from the description of a preferred embodiment into the claims absent an explicit instruction.

"Limiting claims from the specification is generally not permitted absent a clear disclosure that the patentee intended the claims to be limited as shown."  *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333-34 (Fed. Cir. 2007) (citing *Phillips,* 415 F.3d at 1323). Similarly, the Federal Circuit has cautioned that it is generally inappropriate for a court to limit a claim to a specific preferred embodiment.  *Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367, 1372 (Fed. Cir. 2010) (holding it improper to limit claims to the preferred embodiment without a clear intent that patent drafters restricted their claims to that preferred embodiment); *see also Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011) ("It is true that, in some circumstances, a patentee's consistent reference to a certain limitation or a preferred embodiment as 'this invention' or the 'present invention' can serve to limit the scope of the entire invention, particularly where no other intrinsic evidence suggests otherwise."); *Voda*

*v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (refusing to infer a limitation where parts of the specification referred to a certain embodiment as the "present invention" because the specification did not uniformly refer to the invention as being so limited, and the prosecution history did not reveal such a limitation).

Here, although the specification makes reference to several of the preferred embodiments, Defendants have pointed to nothing in the specification or prosecution history that shows the inventors intended to restrict the claims of the '637 Patents only to those preferred embodiments, such as consistent references to the embodiments as "present invention." Even then, the Federal Circuit has determined that "use of the phrase 'present invention' or 'this invention' is not necessarily limiting, such as where the references to a certain limitation as being the 'invention; are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent." *Absolute*, 659 F.3d at 1136-37. Here, such explicit references are virtually absent from the specification. In that connection, I note that the specification itself warns against undue reliance on the preferred embodiment by explaining:

> The embodiment described above is for exemplary purposes only and is not intended to limit the scope of the present invention. Various adaptations, modifications and extensions of the described assembly will be apparent to those skilled in the art and are intended to be within the scope of the invention as defined by the claims that follow.

'637 Patent, Col. 7, lines 53-58. While the inclusion of this sort of language does not dictate my construction of the claims, it cautions against reading limitations into the claims. *Accord Honeywell Intern., Inc. v. Nikon Corp.,* 589 F. Supp. 2d 433, 442 (D. Del. 2008) ("[T]he language in the . . . specification referring to other embodiments is not boilerplate 'catch-all' legalese, but rather reflects a deliberate effort by the patentee to use an example to help describe

the invention and its embodiments.").   I therefore find it inappropriate to generally restrict the claims to the preferred embodiments or the specifications' descriptions thereof.

That said, the Federal Circuit case law discussed above makes clear that the Court must engage in a term-specific inquiry in determining whether a particular claim limitation should be imported, and as discussed in more detail *infra*, I am indeed required to look to the specification to define those claim terms stated in the "means-plus-function" structure.   Accordingly, in analyzing each of the disputed claim terms, I will look to whether there are "other statements and limitations in the patent" and the figures that are consistent with the proposed limitation, *American Piledriving Equip. v. Geoquip, Inc.*, 637 F.3d 1324, 1334 (Fed. Cir. 2011), or whether the specification does not uniformly refer to the invention as being limited in the specific manners that Defendants suggest.

### C.  Claim Construction

### 1.   "light diffusing means . . ."

The parties first dispute how the term "light diffusing means for dispersing light emanating from within the hollow body should be construed, as illustrated by the chart below.

| Claim(s) | Term to Construe | LMT's Proposed Definition | Defendants' Proposed Definition |
|---|---|---|---|
| 1, 11, 15 | light diffusing means for dispersing light emanating from within the hollow body | <u>Function:</u> dispersing light emanating from within the hollow body<br><u>Structure:</u> any coating or physical variation on the sidewall surfaces which act to disperse light, *e.g.*, translucent coating, ridge(s), bevel(s), curvature(s), discontinuities, interruptions, or other similar design features, or other surface modifications that act to diffuse or disperse light, and all equivalents thereof | Either a translucent lens or a transparent lens with ridges covering the entire surface of the lens |

Both parties agree that the patent terms are in the "means-plus-function" format envisioned by 35 U.S.C. § 112 ¶ 6, which provides that "an element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 (6). The Federal Circuit has established a two-part test for construction of a means-plus-function limitation: "First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs the function." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (internal quotation marks omitted) (quoting *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006)); *Micro Chem., Inc. v. Great Plains Chem. Co.*,

*Inc.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999) ("Application of § 112, ¶ 6 requires identification of the structure in the specification which performs the recited function.).

In construing a means-plus-function limitation, the court may not "adopt[] a function different from that explicitly recited in the claim" nor "incorporate[e] . . . structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc.*, 194 F.3d at 1257-58; *see also In re Aoyama*, 656 F.3d 1293, 1296-97 (Fed. Cir. 2011) ("The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations." (Internal quotation marks omitted.)). To that end, "[i]t is well-established that the specification must be read as a whole to determine the structure capable of performing the claimed function." *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1367 (Fed. Cir. 2012) (internal quotation marks omitted). Accordingly, "[a] structure disclosed in the specification is a corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (internal quotation marks omitted).

I begin by identifying the claimed function. The parties largely agree in their briefing that the claimed function is "dispersing light emanating from within the hollow body."[4] Defendants, however, argue in their reply papers that the function is both "light diffusing" *and* "light dispersing." *See* Def. Reply, 2-4. Specifically, Defendants point to correspondence with the USPTO in the patent prosecution that stated that the '637 Patent was distinguished from prior art because the prior art "fail[ed] to disclose, an apparatus/assembly that includes, *inter*

---

[4]    In the Joint Claim Construction and Prehearing Statement, Dkt. No. 63, App'x, LMT, Home Tops and McFarland agreed that the function was "dispersing light emanating from the hollow body," whereas Maine appeared to argue that the function was "light diffusing" but did not explicitly set forth a proposed claimed function. In the briefing and at the *Markman* hearing, Maine and Home Tops now advance the same argument as set forth above.

*alia*, a connector member having light diffusing means for dispersing light" and rather taught "a multi-piece assembly having four separate, *transparent* (*i.e.*, non-diffusing and non-dispersing) panes of glass . . . ." *See* Amendment and Response to USPTO Action, Oct. 22, 2003, 9.[5] Defendants also point to another position taken during the patent prosecution, reciting two different definitions for disperse and diffuse:

> diffuse: "[T]o break up and distribute light (incident) . . ."
> disperse: "[T]o cause to become spread widely . . . [or] to subject (as light) to dispersion . . . ."

Amendment and Response to USPTO Action, Oct. 22, 2003, 8 (quoting Websters Ninth New Collegiate Dictionary 353 (1987)). Based on these distinctions, Defendants contend that the claimed function is both to disperse *and* to diffuse light emanating from within the hollow body—*i.e.*, that that these are separate functions embodied within the same means-plus-function structure. *See* Def. Joint Reply, 3. Notwithstanding the citations above, LMT counters that there is nothing explicit in the prosecution history showing that the claimed function is for dispersing and diffusing light; instead LMT's relies on the term "light diffusing" as clarifying the type of means at issue, not the function. *See, e.g.*, LMT *Markman* Br., 6, 8 (referring to the "light diffusing means" claimed in the '637 Patent).

I conclude that the function claimed is "dispersing light emanating from within the hollow body," and that "light diffusing" is merely an adjective describing the type of means claimed. *Cf. Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 949-50 (Fed. Cir. 2007) (rejecting plaintiff's argument that the use of the term "control" to describe "means" removed the phrase "control means" from means-plus-function analysis, agreeing with the

---

[5]    The Amendment and Response to USPTO Action, Oct. 22, 2003 is attached as Exhibit C to the Declaration of Melanie A. Miller filed in support of Defendants' Opening *Markman* Brief, Dkt. 74-1.

district court's reasoning that the "reference to 'control' is simply an adjective describing 'means:' [sic] it is not a structure or material capable of performing the identified function"). The use of the term "diffusing means" elsewhere in the '637 Patent claims and specification further support my conclusion. For example, Claim 2, which is dependent on Claim 1, refers to "said light diffusing means," '637 Patent, Col. 8, lines 6-7, and Claim 14, which is also dependent on Claim 1, refers to a "diffusing means," *id.* at Col. 8, lines 51-52; notably, both Claims 2 and 14 describe additional limitations on the type of diffusing means not present in Claim 1. *See, e.g.*, *id.* ("wherein said diffusing means includes a corresponding plurality of translucent lens . . ."). Additionally, the specification employs the term "diffusing means" throughout. *See, e.g.*, *id.* at Col. 3, lines 45-53. The repeated use of the term "diffusing means," rather than simply "means," suggests that the patent drafters were seeking to ensure that the specific means claimed could be clearly identified in both the claims and the specification—perhaps to avoid confusion with the other means-plus-function terms claimed in the '637 Patent, such as the "engaging means" found in Claims 1, 11, and 15. Thus, I reject Defendants' contention that the claimed function is both to disperse and diffuse light. Rather, the '637 Patent claims a "diffusing means" that functions to "disperse light emanating from within the hollow body."

The second step in my analysis is to identify the corresponding structure in the specification that performs the function of dispersing light emanating from within the hollow body. Defendants argue, based largely on their contention that the claimed function is both to disperse and diffuse light, that the structure is "either a translucent lens or a transparent lens with ridges covering the entire surface of the lens." According to Defendants, because the function is both to diffuse and disperse light, the means can be only associated with those structures in the

specification that satisfy both the diffusing and dispersing function. In that connection, Defendants point to the preferred embodiments of the '637 Patent in Figures 4 and 5 that show diffusing means, arguing that each of these embodiments share a common characteristic: the structures cover the entire surface of the lenses/panes that make up these claim elements. *See* Def. *Markman* Br., 13-14; Def. Reply Br., 4. Thus, Defendants reason, the structures associated with this means plus function claim language necessarily are those shown in Figures 4 and 5—*i.e.*, diffusing and dispersing structures that cover the entire lens or connector member. Beyond this, however, Defendants point to nothing else in the claim language, specification, or prosecution history that requires the diffusing means to cover the entire surface of the lens or connector member.

LMT argues that the light diffusing means structure is clearly defined in the summary of invention portion of the specification as a structure comprised of "any coating or physical variation" that "acts to disperse light that may emanate from within the transparent connector member." '637 Patent, Col. 3, lines 47-50. In that connection, LMT acknowledges that Figures 4 and 5 of the '637 Patent respectively show embodiments with the light diffusing means structure either (1) as "translucent lenses" that act to "diffuse[e] the light [emanating from the hollow body] as it passes through," or (2) with "the connector member [being] substantially transparent such that light may pass from within the member." *Id.* at Col. 6, lines 19-21, 38-40. LMT, however, rejects that these are the only two embodiments of this light diffusing means claimed by the '637 Patent, and points to variations of the diffusing means identified in certain dependent claims. For example, LMT explains that Claim 3, which is dependent on Claim 1, identifies the light diffusing means as a "plurality of ridges [that] are continuously spaced on and across the lateral extent of said at least one surface of said sidewalls." *Id.* at Col. 8, lines 10-12;

17

*see also id.* at Col. 8, lines 13-15 (describing in dependent Claim 4 the same apparatus as Claim 3, except "wherein said ridges are oriented perpendicular to said top and bottom ends of the hollow body"). LMT argues that under the doctrine of claim differentiation, because the dependent claims list several alternative structures, it is presumed that the claimed structure in the independent claim includes those exemplified in the dependent claims as well as any structure set forth in the specification. *See Phillips*, 415 F.3d at 1315. At a minimum, LMT argues that nothing in the independent or dependent claims supports Defendants' position that the light diffusing means is a structure that covers the entire surface of the lens or connector member. LMT further notes the absence of any express disclaimer in the patent or the prosecution history limiting this structure to the preferred embodiments, or requiring the light diffusing means to cover the entire lens or connector member.

I conclude that the light diffusing means structure is "any coating or physical variation" that "acts to disperse light that may emanate from within the transparent connector member." '637 Patent, Col. 3, lines 47-50. Such a structure includes those embodiments in Figures 4 and 5, where the light diffusing means structure covers the entire lens or connector member, but the light diffusing means is not limited to these structures. I reject Defendants' argument that the light diffusing means must cover the entire lens or connector member as improperly importing limitations from the preferred embodiments into the claim. *See Laryngeal Mask Co.*, 618 F.3d at 1372; *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d. 1361, 1369 (Fed. Cir. 2005) (explaining that a proper means-plus-function construction should account for "all structure in the specification corresponding to the claimed function" without limitation to a preferred embodiment).

As noted, in construing means plus function claim language, the Court must identify the structure in the specification that corresponds to the claimed function. Here, the structure is any coating or physical variation that acts to disperse light emanating from within the hollow body. Contrary to Defendants' argument, there is nothing in the specification that further requires this structure to cover the entire surface area of the lens or connector member that allows the light to emanate from within the hollow body. Adopting Defendants' proposed construction would therefore run afoul of the principle that a court should not "incorporate[e] . . . structure from the written description beyond that necessary to perform the claimed function."[6] *Micro Chem., Inc.*, 194 F.3d at 1257-58. Similarly, the fact that the dependent claims contain specific limitations on the type of structure for the light diffusing means further suggests that the independent claim in is not limited to only those types of structures. *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). Put

---

[6] Defendants argue that if the structure is "any coating of physical variation" and there is no requirement that the structure cover the entire surface of the lens or connector member, then "[t]aken to its extreme, this definition would encompass any post cap product with a simple scratch on a tiny portion of a transparent pane of glass, a small dimple, or even a curve in the glass that bends light gleaming on it at the smallest angle." Def. Reply Br., 5. I disagree. When read in the context of the claims, the structure is sufficiently specific to illuminate the claimed means-plus-function limitation. Given the constructions proposed by LMT in this claim construction proceeding, it is difficult to imagine that LMT would argue that a simple scratch satisfies the light diffusing means requirement of the claims. More importantly, however, as the Federal Circuit has observed, "a sound claim construction need not always purge every shred of ambiguity." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007). Rather, "after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) *quoted in Acumed, supra* at 806. I am satisfied that my construction set forth above aligns with the specificity and precision of the language of the '637 Patent, and that fact-finder could make an informed decision based on this construction in an infringement proceeding.

differently, reading the structure of "light diffusing means" in independent Claim 1 to mean "a transparent lens with ridges covering the entire surface of the lens" would render superfluous the following language in Claim 2: "a plurality of ridges [that] are continuously spaced on and across the lateral extent of said at least one surface of said sidewalls," '637 Patent, Col. 8, lines 10-12, and thus suggests that the language in Claim 1 is not so limited.   *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369-70 (Fed. Cir. 2007) (noting that doctrine of claim differentiation may be helpful in determining proper construction where a proposed construction would render a claim redundant or superfluous) (citing *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)).

Moreover, the claim language itself recites that the sidewalls of the hollow body "*include* a light diffusing means."   '637 Patent, Col. 8, line 1 (emphasis added).   The term "include" in a patent claim is a term of art generally understood to mean that the that "the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."   *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003) (internal quotation marks omitted).   Defendants have not pointed to anything in the patent or its prosecution history to show that the drafters intended a different meaning of the term "include."   *See Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1356 (Fed. Cir. 2000) ("Claim terms receive their ordinary and customary meaning unless the patentee assigns a special meaning.").   Here, by using the term include with respect to the hollow body sidewalls, the claim can be read as allowing for the sidewalls to simultaneously include a light diffusing means and a non-light diffusing means and still fit within the scope of the claim language.   Thus, the context of the claim language in which this disputed claim term appears undermines Defendants' argument that

the light diffusing means must cover the entire lens or connector member that allows light to emanate from the hollow body sidewalls.

Lastly, as noted above, the specification includes language expressly broadening the patent beyond the preferred embodiment, stating that: "[t]he embodiment described above is for exemplary purposes only and is not intended to limit the scope of the present invention. Various adaptations, modifications and extensions of the described assembly . . . are intended to be within the scope of the invention as defined by the claims . . . ." '637 Patent, Col. 7, lines 53-58. *See LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 2007 WL 980419, *8-*9 (D.N.J. Apr. 2, 2007) (GEB) (rejecting limitation where similar language included in specification).

In my view, reading the specification as a whole, the inventors did not limit their invention to a light diffusing means structure that covered the entire lens or connector member but, rather, used the examples in Figures 4 and 5 of ridges or translucent coatings that covered the entire lens or connector member to "make their specification more accessible." *Honeywell*, 589 F. Supp. 2d at 442-43 ("Pairing a description of a specific, concrete use of the invention with a generalized description of the invention, the specification thus uses an example in the usual way to clarify the broader concept.") They should not be punished for attempting to clarify their invention and render the specification more teachable. *Accord id.* at 443.

Accordingly, I adopt LMT's proposed construction of the claim language "light diffusing means for dispersing light emanating from within the hollow body," to mean a function of dispersing light emanating from within the hollow body, with the structure being any coating or physical variation on the sidewall surfaces which acts to disperse light.

## 2. "Axially slidably engaging"

The parties next propose varying constructions of the term "axially slidably engaging," which is found in Claims 1, 11, and 15.

| Claim(s) | Term to Construe | LMT's Proposed Definition | Defendants' Proposed Definition |
|---|---|---|---|
| 1, 11, 15 | axially slidably engaging | Plain and ordinary meaning *Or* able to contact and slide along an axis | (1) placement of the post cap on the post downwardly along the longitudinal axis of the post and (2) all sides of the second engaging means contact the post during the placement so that the post cap cannot move laterally with respect to the post during insertion onto the post |

The parties agree that this claim term has two separate aspects: the device must be both "axially" engaging and "slidably" engaging. Furthermore, although LMT does not believe construction of this claim term is necessary, it acknowledged during the *Markman* hearing that it agreed with Defendants' proposed construction of "axially"—"the placement of the post cap on the post downwardly along the longitudinal axis of the post." *See Markman* Hearing Trans., T22:5-12 (agreeing with part one of Defendants' proposed construction of "axially slidably engaging"). According to the parties, "axially" engaging does not mean that the post cap apparatus is attached from the side of the post or at any diagonal or other angle. This construction is supported by the specification and prosecution history. *See, e.g.*, '637 Patent, Col. 5, lines 13-19 (describing connector members in Figures 2 and 3 as axially aligned with the top of the fence post). Accordingly, the Court adopts Defendants' proposed construction that "axially" in the term "axially slidably engaging" means that the claimed post cap apparatus is placed on the fence post downwardly along the longitudinal axis of the post.

The second part of this claim term, "slidably" engaging, is heavily debated by the parties. As an initial matter, Defendants rely on the prosecution history in which the patent application was amended during the *ex parte* reexamination proceeding from the original language "slidably engaging" first to "axially engaging" and then finally to "axially slidably engaging," to show that independent meaning must be given to each of the words in this claim term. *See* Def. Reply Br., 7 (citing January 30, 2012 Amendment and Response). On this basis, Defendants contend that the term "slidably" refers both to the "fit"/dimensions and the "type" of engaging mechanism. *See* Def. *Markman* Br., 15. LMT in contrast argues that the term simply refers to the type of engaging mechanism unrelated to the fit or dimensions, and thus Defendants' construction improperly imports limitations into this claim. *See* Pl. Reply Br., 16-17; *Markman* Hearing Trans., T23:7-15.

Defendants posit that to be slidably engaging, "all sides of the second engaging means contact the post during the placement so that the post cap cannot move laterally with respect to the post during insertion onto the post." Def. *Markman* Br., 15. In support, Defendants cite a portion of the specification that describes Figure 1, and recites that the tabs of the connector member shown in Figure 1 "are slidably receivable within the fence post cavity. Typically, the tabs 22 will be constructed such that they nest securely within the cavity [of the fence post] 12 and thereby prevent undesired lateral movement of the connector member 20 and provide some resistance to removal." '637 Patent, Col. 4, lines 47-50. According to Defendants, this description of the tabs as "axially slidably engaging" in a manner that will cause them to "nest securely within the cavity" and "prevent undesired lateral movement" requires defining "slidably" to mean that all sides of the post cap must contact the fence post; if only one side of the post cap contacts the fence post while engaging, then the other sides cannot be considered to

be slidably engaging. *See* Def. Reply, 7 ("[I]f the inner dimension of a post cap were larger than the outer dimension of a post onto which it was mounted . . . it would not be "slidable" (the only way to make the post cap slidable would be to push one side of the post cap against one side of the post, but the other three sides of the post cap would not touch the post)."). In light of this, Defendants argue that in order for the apparatus to be axially slidably engaging: (1) the post cap slides along an axis, *and* (2) a sufficiently tight connection between the post cap and the fence post. *Id.* at 7-8. Thus, according to Defendants, a "slidable" connection is one where "contact exists on all sides of the joined post cap and post." *Id.* at 8.

LMT contends that no construction is necessary to define "slidably" in the claim term "axially slidably engaging," and relies on the plain and ordinary meaning of slidably as "translationally moving an object in a straight line" with respect to another object. *See Markman* Hearing Trans., T23:14-15. "Slidably," according to LMT, merely refers to this type of motion, distinct from a rotational/screw-like, motion, or a ratcheting/zipping together motion. *See id.* at T23:7-14 ("Two objects sliding together is the motion as opposed to being rotated together, as in a screw-type fastener, or maybe ratcheted together, if you can picture, like the ratchets on a zip tie, or something like that, where as you are sliding, maybe something is clicking further into place."). LMT grounds its proposed construction on the lack of any explicit limitation in the specification or prosecution history defining slidably in the manner proffered by Defendants—*i.e.*, that all sides of the post cap must contact the fence post. Furthermore, LMT argues that the reexamination proceeding actually supports its construction, not Defendants'. Accordingly to LMT, the claim term was amended from "slidably engaging" to "axially slidably engaging" to distinguish the '637 Patent over the prior art of Frost, which provides for a light that attached with a screw onto the top of a post. Thus, during the

reexamination proceeding, LMT amended the claim language to "axially slidably engaging," to distinguish the engaging movement from the screw engagement in Frost. *See* January 30, 2012 Amendment and Response, 5-7;[7] *Markman* Trans., T24:17-T25:14 ("[I]t was discussed and ultimately agreed with the examiner that the clarification that the engagement is axial lined up . . . and slidably was used to distinguish the screw element of Frost.").

I conclude that LMT's proposed construction, "able to contact and slide," is more appropriate, finding that Defendants' proposed construction of the term "slidably" to be unsupported by the intrinsic evidence. To begin, nothing in the specification or prosecution history supports that the inventors intended something other than the ordinary, customary meaning of the term "slidably" proposed by LMT: contact and movement in a line relative to another body, as distinguished from rotational movement. Although, as noted, Defendants rely on certain language in the specification describing how the tabs in Figure 1 are "slidably receivable" and "nest securely" to "prevent undesired lateral movement," contrary to Defendants' argument, I do not find that this description of Figure 1 is intended to define and limit the scope of the term slidably. Rather, this description of the tabs refers to the engaging means, a separate claim term requiring construction.

Moreover, even if this description of Figure 1 could be read to define axially slidably engaging in a particular manner in which all sides of the post cap contact the fence post along the longitudinal axis of the post, it does not follow that the term slidably is limited to this particular description. This description pertains only to one preferred embodiment of the claim terms; nowhere do Defendants point to language in the specification or prosecution history supporting

---

[7]     The January 30, 2012 Amendment and Response is attached as Exhibit E to the Declaration of Melanie Miller in support of Defendant Maine's Partial Motion for Summary Judgment, Dkt. 66-8, and cited by Defendants in their Joint *Markman* Reply Brief.

the additional limitation proposed by Defendants—that slidably means "contact exists on all sides of the joined post cap and the post."  It would therefore be improper to import such a limitation into this claim term.  *MBO Labs., Inc.*, 474 F.3d at 1333-34 ("Limiting claims from the specification is generally not permitted absent a clear disclosure that the patentee intended the claims to be limited as shown." (Citing *Phillips,* 415 F.3d at 1323)).  Absent any express intent to do so, I find it inappropriate to limit the term "slidably" to Defendants' interpretation of the preferred embodiment.  *Laryngeal Mask Co.*, 618 F.3d at 1372.

In contrast, LMT's proposed construction, "able to contact and slide," aligns with the specification and prosecution history, which show that the common and ordinary use of the term "slidably" applies and is intended to refer only to the type of engaging movement between the post cap and post, and not to the dimensions of either.  In that connection, I note that although the claim term must be read in the context of the specification, courts may turn to common definitions where the ordinary meaning of claim language as understood by a person of skill in the art is readily apparent.  *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").  Here, I find further support for LMT's proposed construction in the definitions adopted in patent cases analyzing the term "slidably" in other contexts, which further suggests Defendants' proposed construction incorporating a dimensional element into the term "slidably" is misplaced.  *See, e.g.*, *MBO Labs., Inc.*, 474 F.3d at 1333 (construing "slidably receiving" to refer to the physical relationship between the guard body and the needle, such that the guard body is capable of sliding relative to the needle," and thus the term "permit[s] the needle and guard to slide in any manner"); *Larson*

*Mfg. Co. of S. Dakota, Inc. v. Aluminart Products Ltd.*, 504 F. Supp. 2d 759, 766 (D.S.D. 2007) (construing "slidably engages" and "slidably engaging" to mean "to engage by sliding"); *Chip-Mender, Inc. v. Sherwin-Williams Co.*, 458 F. Supp. 2d 994, 1007 (N.D. Cal. 2006) ("'Slidably located' in the passageway means that the nib is located or positioned in the passageway or channel, and that it moves, or 'slides,' within the passageway."); *Airborne Athletics, Inc. v. Shoot-A-Way, Inc.*, CIV. 10-3785 SRN/JJK, 2011 WL 6740330, at *12 (D. Minn. Dec. 21, 2011) ("The term 'lift frame slidably mounted to the vertical support,' is therefore construed as 'a support structure which is slidably mounted to the vertical support to allow the lift frame to slide up and down on the vertical support.'); *see also Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1361 (Fed. Cir. 2005) (distinguishing "slidably mounted" from "rotatably mounted").

For these reasons, I construe the term "axially slidably engaging" to mean placement of the post cap on the post downwardly along the longitudinal axis of the post and able to contact and slide along the axis of the fence post.

### 3. "dimensioned to provide resistance to removal"

The parties disagree over how to construe the term "dimensioned to provide resistance to removal" found in Claims 1, 11, and 15. They propose the following constructions:

| Claim(s) | Term to Construe | LMT's Proposed Definition | Defendants' Proposed Definition |
|---|---|---|---|
| 1, 11, 15 | dimensioned to provide resistance to removal | Plain and ordinary meaning *Or* Sized to provide some impedance to disconnection between two interfaced structures | The relative dimensions of the engaging means and the top of the fence post are such that significant frictional engagement will exist between them to make the post cap as difficult to remove as if a set screw or adhesive were utilized |

Neither party provides a useful construction of this claim language. First, Defendants' proposed construction, describing the dimensions being such that the post cap is as difficult to remove as if a screw or adhesive, is contradicted by the specification. The '637 Patent explicitly provides an example of an embodiment where, *in addition to* the post cap being "dimensioned to provide resistance to removal," "to further secure the connector member 20, the engaged tabs may be affixed to the interior post wall using an adhesive or, if removal of the connector is required, a mechanical means such as a screw." '637 Patent, Col. 4, lines 44-50; *see also id.*, Col. 7, lines 47-52 (describing how the connector member of the post cap further "may be secured [to the post] using a fastening means. Generally *an adhesive or mechanical means* will be used to secure the connector member to the interfacing structures. . . . [I]f further access is required to within the accessory, a removal mechanical fastener *such as a screw* is preferable.").

Defendants' proposed construction renders superfluous this description of the use of an adhesive. Put differently, the inclusion of a description of an adhesive or screw as an additional fastening means strongly suggests that the relative dimensions of the post cap and post do not provide the same resistance to removal "as if a set screw or adhesive were utilized." *See Phillips*, 415 F.3d at 1314 ("[T]he claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Nowhere else in the specification or claims is a screw or adhesive associated with how much resistance exists to remove the post cap from the post. Indeed, as noted earlier, LMT sought to distinguish the '637 Patent from the prior art of Frost through avoiding the requirement of a screw fastener to secure the post cap to the post. *See supra*, Part III.C.2. In light of this, I find it inappropriate to construe "dimensioned to provide resistance to removal" as equivalent to the resistance of a

screw or adhesive fastener. With this portion of Defendants' proposed construction describing an adhesive or set screw discarded, the remaining proposed construction—the dimensions create "significant frictional engagement"—provides no additional clarity to the disputed claim term, and thus is not a proper construction. *See Funai Electric Co. v. Daewoo Elects. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The criterion is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention.").

LMT's proposed construction also provides little guidance. LMT first contends that no construction is necessary, and alternatively proposes that the claims terms be construed to mean "sized to provide some impedance to disconnection between two interfaced structures." This construction provides no more clarification to a juror than the claim language. Indeed, as counsel stated during the *Markman* hearing, the claim term "resistance" and the proposed construction term "impedance" are essentially synonyms. *Markman* Trans., T17:18-20. I find that neither terms provides sufficient clarity to determine the amount of resistance or impedance required by this claim term.

Defendants also provide an alternative proposed construction in their *Markman* briefing, relying on certain terms in the specification: one in which the inner dimension of the post cap is smaller than the outer dimension of the post onto which it is placed. According to Defendants, with these dimensions, the post cap would need to be forced atop the post to get the post cap to properly "seat" on top of the post, thus offering significant resistance to removal; however, if the inner dimension of the post cap is equal to or larger than the outer dimension of the post, "there is no resistance to removal." Def. Reply, 6. Like with the other proposed constructions, I find this construction fails to provide the necessary clarity for this claim language. For example, if the dimensions of the post cap are fractionally smaller than the post onto which it is placed, then

Defendants may be correct that such dimensions would provide "some resistance to removal." On the other hand, if the dimensions of the post cap are significantly smaller than the post, it would be impossible for the post cap to fit onto the post. Yet Defendant's proposed construction fails to account for this problem, and I reject it accordingly.

As the Court cannot accept either party's proposed construction, it instead adopts its own construction. I do agree, however, with Defendants that this claim language is best illuminated by certain descriptions in the specification. *See Phillips*, 415 F.3d at 1315 ("'[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive . . . .'" (Internal quotation marks omitted.)). Although the term "dimensioned to provide resistance to removal" does not appear in the specification, there are, as Defendants identify, several references throughout regarding the nature of the fit between the fence post and the post cap apparatus:

- "The tabs [of the post cap] will be constructed such that they nest securely within the [post] cavity 12 and thereby prevent undesired lateral movement of the connector member 20 and provide some resistance to removal." '637 Patent, Col. 4, lines 47-50.

- "Once the engaging means is properly aligned, *pressure is applied* such that the engaging means seat with the fence post." *Id.* at Col. 7, lines 34-36 (emphasis added).

- "Once the connector member is securely interfaced with the fence post (*i.e.*, flushly mounted), an accessory may be placed on the connector member's second interface surface such that the second engaging means are properly aligned with the accessory. *Again, force is applied* to set the engaging means with the accessory." *Id.* at Col. 7, lines 36-40 (emphasis added).

Certainly, these descriptions in the specification do not set forth the relative dimensions or the amount of resistance needed to "secure" the post cap to the post; however, the repeated use of the terms "secure," "securely," "set," and "seat," combined with the description requiring that

"pressure" or "force" must be applied to engage the post with the post cap, informs the amount of resistance required for removal. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). In that regard, I find that the description of the engaging means of the post cap as requiring an application of force or pressure to become securely interfaced with the post also extends to the inverse: the removal of the post cap from the post requires the application of at least as much force or pressure. Thus, I construe the claim term "dimensioned to provide resistance to removal" to mean that the post cap is dimensioned relative to the post onto which it fits such that in order to remove the post cap, the same or greater amount of force or pressure must be applied as was applied to securely engage the post cap onto the post.

This construction illuminates the claim language by tying the amount of resistance required for removal to the amount of force or pressure necessary to engage the post cap, which in turn provides a workable, testable description of the claim language consistent with the '637 Patent's stated purpose of providing "an apparatus for securely attaching accessories to the end of a synthetic fence post without structurally degrading the fence post." '637 Patent, Abstract. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1121 (Fed. Cir. 2004) (noting that the abstract "section of a patent speaks generally to the invention"); *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document. Thus claims must be construed so as to be consistent with the specification, of which they are a part.").

### 4. "engaging means," "first engaging means," "second engaging means"

The parties disagree over how to construe the terms "engaging means," found in Claim 11, and "first engaging means" and "second engaging means" found in Claims 1 and 15. They propose the following constructions:

| Claim(s) | Term to Construe | LMT's Proposed Definition | Defendants' Proposed Definition |
|---|---|---|---|
| 11 | engaging means | Function: contacting with another structure, such as a fence post or a top member.<br><br>Structure: one or more tabs, sidewalls, walls, or their equivalents that extends across an interface plane between two structures and receives or is received within one of the structures. | A continuous upward-facing sidewall around the periphery of an upper shoulder of the hollow body which fits over the outside perimeter of a top member or is slidably received within a top member such that the top member rests on the upper edge of the upward facing side wall. |

| | | | |
|---|---|---|---|
| 1, 15 | first engaging means | A first of two or more "engaging means," as defined above. | A continuous upward-facing sidewall around the periphery of an upper shoulder of the hollow body which fits over the outside perimeter of a top member or is slidably received within a top member such that the top member rests on the upper edge of the upward facing side wall. |
| 1, 15 | second engaging means | The second of two or more "engaging means," as defined above. | A plurality of downward-facing tabs arranged about the connector member's lower peripheral edge and oriented such that they are perpendicular to the interface plane between the post and the connector member. The downward-facing tabs are disposed such that they are slidably receivable within a fence post cavity, nested securely within the cavity, prevent lateral movement of the connector member and provide resistance to removal. |

As before, the parties also agree that these claim terms should be interpreted in the means-plus-function format under 35 U.S.C. § 112(6). *See supra* Part III.C.1. Thus, I follow the two-step approach condoned by the Federal Circuit: "First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs the function." *Noah Sys., Inc.*, 675 F.3d at 1311.

With respect to the function of this limitation, LMT proposes "contacting with another structure, such as a fence post or a top member." Defendants provide no proposed function of "engaging means." In that regard, review of Defendants' proposed constructions of these claim terms suggests that Defendants agree with LMT's proposed function, except that they would likely limit the function to the specific placement of the structures in their proposed

construction—*i.e.*, the function of the "engaging means" and "first engaging means" is to contact with the top member, whereas the function of the "second engaging means" is to contact with the fence post. After reviewing the context in which these claim terms appear, I agree with LMT that the function of the "engaging means" is contacting with another structure, such as a fence post or a top member. I find no basis in the claim language to import the specific limitations into the function for this claim term as Defendants might suggest based on their proposed constructions. *See In re Aoyama*, 656 F.3d at 1296-97 ("The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations." (Internal quotation marks omitted.)); *see also Biomedino*, 490 F.3d at 949-50 (finding adjective that preceded term "means" in means-plus-function claim to be merely identifying).

On the other hand, review of the terms "first engaging means" and "second engaging means" in the context of the claim language reveals that the term "first engaging means" consistently refers to a connection between the hollow body of the post cap apparatus and the top cap, while the term "second engaging means" consistently refers to a connection between the hollow body and the fence post. *See* '637 Patent Reexam. Cert., Col. 1, lines 38-42 ("a first engaging means provided at said top end of said hollow body for engaging said top member; and second engaging means provided at said bottom end of said hollow body for engaging a top end of said fence post"); *id.*, Col. 2, lines 33-37 ("first engaging means provided at said top end of said hollow body; second engaging means provided at said bottom end of said hollow body for axially slidably engaging a top end of said fence post"); *id.*, Col. 2, lines 39-40 ("a top member adapted to engage said first engaging means"); *id.*, Col. 2, lines 53-55 ("wherein said first engaging means is axially slidably engageable with said top member"). Because I must

construe the function of a means-plus-function claim term according to the claim language, I find that the function of the term "first engaging means" is to contact the hollow body with the top member, whereas the function of the "second engaging means" is to contact the hollow body with the fence post. *See In re Aoyama*, 656 F.3d at 1296-97; *cf. Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (holding that "[d]ifferent terms or phrases in separate claims may be construed to cover the same subject matter where the written description . . . indicate[s] that such a reading of the terms or phrases is proper").

I turn next to the structure or structures associated with these means-plus-function limitations. LMT proposes essentially the same structure for all three of these claims terms—any structure that serves the function of contacting with another structure—on the basis that the operative claim language is "engaging means," and the terms "first" and "second" are merely identifying adjectives to distinguish between more than one engaging means. Defendants, in contrast, propose three separate constructions for each of the above claim terms, and limit the structure associated with "engaging means" and "first engaging means" to a "continuous upward-facing sidewall," and with "second engaging means" to a "plurality of downward-facing tabs." Def. *Markman* Br., 2, 17-20. Defendants provide no reasoning for ascribing specific structures to each of these different claim terms, except to state the following:

> [T]he term "engaging means" appears in several claim elements to refer to two different portions of the post cap provided in the '637 Patent: one engaging means typically refers to an engaging means for connecting a body of the post cap to a top member and another engaging means for connecting the body of the post cap to a post . . . .

Def. *Markman* Br., 18.

As noted above, it is true that when multiple engaging means are referenced in a claim or the specification, the terms "first engaging means" and "second engaging means," pertain to a

*function* for connecting the hollow body to the top member and to the fence post, respectively. In construing a means-plus-function claim term, however, the Federal Circuit has made clear that the determination of the term's function is separate from the determination of the structure capable of performing that function. *Noah Sys., Inc.*, 675 F.3d at 1311. Nowhere do Defendants point to claim or specification language consistently describing the terms "engaging means" and "first engaging means" as pertaining to *structures* comprised of a continuous upward-facing sidewall, or the term "second engaging means" as pertaining to a *structure* comprised of a plurality of downward-facing tabs. Indeed, the very next sentence in Defendants' brief, quoting the specification, undermines imposing such limitations:

> The engaging means refer to one or more members that extend from the connector member across the interface plane as defined by the connector member and an interfacing structure. These members may extend perpendicular from the interface planes and be slidably received within their respective interfacing structure or slidably receive their respective interfacing structure. For example, the member(s) that make up the engaging means may comprise multiple tabs that fit within the hollow opening of an interfacing structure, such as a fence post, or may comprise a continuous wall that fits over and slidably receives the end of an interfacing structure. *Additionally, the connector member may be configured such that both interface surfaces have the same engaging means or such that each interface surface contains a different engaging means.*

'637 Patent, Col. 2, lines 18-33 (emphasis added) (quoted in Def. *Markman* Br., 22). Thus, while the specification does provide a specific example of the engaging means as "multiple tabs that fit within . . . the fence post," it does not identify that this engaging means is limited to the "second engaging means" claim language. Rather, the specification indicates the contrary: "both interface surfaces [may] have the same engaging means or . . . a different engaging means."

Defendants' proposed constructions of these claim terms are further belied by other arguments in their *Markman* brief. Defendants rely on the preferred embodiments of the '637

Patent in Figures 4 and 5 to show that in both embodiments, the upper portion of the hollow body post cap is connected to the top member *either* by multiple tabs or a continuous wall. *See* Def. *Markman* Br., 19 (citing '637 Patent, Figs. 4-5). It is unclear to the Court how Defendants could acknowledge that the engaging means structure connecting the post cap to the top member could be either multiple tabs or a continuous sidewall, but nevertheless propose a construction limiting the "first engaging means" only to a continuous upward facing sidewall. Neither the specification, as discussed above, nor the claim language supports such a limitation. For example, Claim 1, which identifies the "first engaging means" for connecting the top member to the hollow body and the "second engaging means" for connecting the hollow body to the fence post, provides that "*at least one of* said first and second engaging means comprises multiple tabs . . . ." '637 Patent Reexam. Cert., Col. 1, lines 38-42, 47-48.

In light of this, I find no basis to adopt Defendants' narrow constructions of the structures associated with these claim terms, which import limitations not contemplated by the patent claims, specification, or prosecution history. *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) ("[W]hen claim language is broader than the preferred embodiment, it is well settled that claims are not to be confined to that embodiment."); *Innova/Pure Water Inc.*, 381 F.3d at 1117 (stating that "[p]articular embodiments appearing in the written description will not be used to limit claim language that has a broader effect"). Instead, because I conclude that LMT's proposed construction of the structure associated with "engaging means" comports with the intrinsic evidence, I adopt that construction here.

Accordingly, I construe the means-plus-function claim term "engaging means" to mean a structure of one or more tabs, sidewalls, walls, or their equivalents that extends across an interface plane between two structures and receives or is received within one of the structures,

and having the function of contacting with another structure, such as a fence post or a top member. The terms "first engaging means" and "second engaging means" mean a structure of the "engaging means," as defined above, respectively having the function of contacting the hollow body with the top member, and contacting the hollow body with the fence post.

5. **"the connector member is a single piece"; "a single piece connector member"**

The parties disagree over how to construe the terms "the connector member is a single piece" and "a single piece connector member," found in Claims 13 and 15, respectively. They propose the following constructions:

| Claim(s) | Term to Construe | LMT's Proposed Definition | Defendants' Proposed Definition |
|---|---|---|---|
| 13 | the connector member is a single piece | Plain and ordinary meaning. *Or* A component that connects one thing to another. | A connector member that has a hollow body, first engaging means, and a second engaging means integrally molded into a single, unitary part. |
| 15 | a single piece connector member | Plain and ordinary meaning. *Or* A component that connects one thing to another. | A connector member that has a hollow body, first engaging means, second engaging means and a top member integrally molded into a single, unitary part. |

LMT proposes that the plain and ordinary meaning of both of these claim terms is appropriate, and that such meaning, based on dictionary definitions, is "a component that connects one thing to another." In that regard, the Federal Circuit has emphasized that in the construction process, "claim terms must be given their plain and ordinary meaning to one of skill in the art." *Thorner*, 669 F.3d at 1367 (quoting *Phillips*, 415 F.3d at 1316). And, where a

patentee does not clearly "assign to a term a unique definition that is different from its ordinary and customary meaning," by acting as its own lexicographer, the ordinary and customary meaning of that term applies. *Laryngeal Mask Co. Ltd.*, 618 F.3d at 1372 (Fed. Cir. 2010); *see also Cortland Line Co.*, 203 F.3d at 1356 ("Claim terms receive their ordinary and customary meaning unless the patentee assigns a special meaning."). Where parties dispute a term that has a "plain and ordinary meaning," *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010), "a court has the duty to resolve the parties' claim construction disputes so the issues are not litigated before the jury." *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). In some instances, however, where the court may be required to construe commonly understood terms, the court may discharge its duty by rejecting the challenging party's proposed construction. *See Finjan*, 626 F.3d at 1206-07.

I disagree with LMT's argument that these claim terms are susceptible to a plain and ordinary meaning, requiring no further construction. "The meaning of a claim term as understood by persons of skill in the art is often not immediately apparent" and thus the Court "must look to the words of the claims themselves, the remainder of the specification, [and] the prosecution history . . . ." *Phillips*, 415 F.3d at 1314 (internal quotation marks omitted); *see also id.* (explaining that the claims "provide substantial guidance as to the meaning of particular claim terms"). Here, while the term "single" may be readily understood, the term "connector member" is not; indeed, this term is at the heart of the '637 Patent. For example, the summary of invention section recites that one of the "object[s] of the present invention [is] to provide an apparatus for securely attaching accessories to a synthetic fence post without structurally degrading the fence post," '637 Patent, Col. 1, lines 49-51, and this object is achieved by the claimed "connector member," which, when "attached to the fence post," provides "a secure base

39

. . . without degrading the post's structural qualities." *Id.* at Col. 2, lines 15-18. More to the point, LMT's argument ignores that Claim 1, on which Claim 13 is dependent, recites a very specific definition of the term "connector member" as "*comprising* a hollow body with a top end and bottom end, wherein the hollow body includes sidewalls extending between said top and bottom ends to define an enclosed space . . . and include a light diffusing means . . . ." '637 Patent Reexam. Cert. Col. 1, lines 28-34. It cannot be said that the term "connector member" is readily apparent to someone of ordinary skill in the art because the '637 Patent is teaching the use of a new and novel connector member as part of a fence post apparatus.

Furthermore, the patent claims clearly distinguish between a "connector member" and a "single piece" connector member. For example, Claim 1 recites a fence post apparatus comprising, *inter alia*, a connector member comprising a hollow body, a top member, and two engaging means to connect the hollow body with the fence post and the top member. No mention is made in Claim 1 of whether the hollow body, engaging means, and/or top member are a single piece. That language is found only in Claim 13, which, in its entirety, reads as follows: "The apparatus of Claim 1, wherein said connector member is a single piece." '637 Patent, Col. 8, lines 49-50. The inclusion of the term "single piece" in Claim 13 suggests that the connector member in Claim 1 is not necessarily a single piece. *See Phillips*, 415 F.3d at 1315. LMT's proposed construction, however, fails to account for this distinction, and is thus untenable. *Cf. Wenger Mfg., Inc. v. Coating Mach Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (applying the doctrine of claim differentiation to avoid reading a limitation from a dependent claim into an independent claim). Accordingly, I reject LMT's proposal that this Court adopt a plain and ordinary meaning of the disputed claim terms in line with a dictionary definition.

Rather, I find Defendants' more detailed constructions for each of the claim terms to be more appropriate, with one exception. Defendants' proposed construction for limiting either term claim to being "integrally molded" must be disregarded. There is nothing in the claims, specification, or prosecution history supporting such a limitation; indeed there is no mention of the phrase "integrally molded" anywhere in the '637 Patent. At most, there is a brief mention in the specification that "for structural integrity the support member 38 connecting member 40 and the interior sidewall 34 may be an integrally formed unit." '637 Patent, Col. 6, lines 11-14. Further review, however, reveals that the "connecting member 40" is not the same as the "connector member" recited in the claims or specification. The connector member is the portion of the apparatus that connects the post with the hollow body or with the top member. *See, e.g.*, '637 Patent Reexam. Cert., Col. 1, lines 28-30. The connecting member, however, refers to a specific embodiment of the connector member, as reflected in Figures 2 and 3 of the '637 Patent, and appears to be an internal structural part of the connector member. *See* '637 Patent, Figs. 2-3. Moreover, even if this portion of the specification also could be read to mean that a single piece connector member may be "integrally molded," nothing further in the specification or prosecution history supports Defendants' proposed construction that this limitation, relating to a specific preferred embodiment, is intended to be present in the claim terms, and thus I find no reason to incorporate such a limitation into the terms "a single piece connector member" or "the connector member is a single piece." *See Laryngeal Mask Co.*, 618 F.3d at 1372.

What remains of Defendants' proposed constructions, however, does find support in the patent claims and specification. As noted above, Claim 1 describes a connector member comprising several component elements, but no mention is made of whether these elements are

41

separate or contained together as a single piece. In contrast, Claim 13, which is dependent on Claim 1, specifically sets forth that "the connector member is a single piece." I conclude that this description of the connector member as a "single piece" is intended to describe a connector member that includes as a single unit all the component parts listed in Claim 1 concerning the connector member—the hollow body, the sidewalls that permit the passage of light therethrough, the first engaging means at the top of the hollow body, and the second engaging means at the bottom of the hollow body. I reach this conclusion based on the context in which "connector member" appears in Claim 1. First, the term "connector member" is defined as "comprising a hollow body" in Claim 1. *See* '637 Patent Reexam. Cert., Col. 1, lines 28-30 ("a connector member . . . comprising a hollow body with a top end and a bottom end"). The "hollow body" in turn is described in Claim 1 as having "a first engaging means provided at said top end of said hollow body" and "a second engaging means provided at said bottom end of said hollow body . . . ." *Id.* at Col. 1, lines 38-42. Second, the specification provides an example of such an embodiment: "The translucent connector member comprises two substantially parallel surfaces each of which contain engaging means for engaging an interface structure . . . ." '637 Patent, Col.. 3, lines 32-35. Although I am cognizant that specific embodiments in the specification generally can not be used to import limitations into claims absent an express intent to do so, here I find the specification to be illuminating of an otherwise ambiguous claim term. *See Lazare Kaplan Int'l, Inc. v. Photoscribe Tech., Inc.*, 628 F.3d 1359, 1369 (Fed. Cir. 2010) (relying on "detailed description" in specification to "further illuminate[]" the plain and ordinary meaning of a claim term where it is not readily apparent); *Am. Honda Motor Co., Inc. v. Coast Distrib. Sys., Inc.*, 609 F. Supp. 2d 1032, 1039 (N.D. Cal. 2009) ("Because the Court finds that the claim language does not clearly illuminate the meaning of this term, the Court looks to the specification for

guidance.").   Indeed, I conclude that these "statements and limitations in the patent" and the figures are consistent with the proposed limitation in my construction.   *See American Piledriving Equip.*, 637 F.3d at 1334.

With respect to the term "a single piece connector member" in Claim 15, I reject Defendants' argument that the structure and punctuation in Claim 15 requires a different construction than the similar term in Claim 13, *i.e.*, one that also includes the top member as part of the single piece connector member.   To begin, Defendants' proposed construction runs counter to the actual wording of Claim 15, which clearly recites a "top member adapted to engage the first engaging means of said connector member . . . ."   '637 Patent Reexam. Cert., Col. 2, lines, 39-40. It would be illogical to construe the term "a single piece connector member" to include, as one single unit, the connector member and the top member when the claim itself provides that the top member is adapted to engage the connector member.   Put differently, there is no reason for the patent to recite an engaging means as part of the top member if the top member is already incorporated into the connector member.   Moreover, nothing in the '637 Patent specification, including preferred embodiments, supports such a construction; there is no example or description given of a connector member and top member being part of the same, single unit.   Rather, as noted above with respect to Claim 13, the specification and preferred embodiments consistently describe a connector member that must be engaged to a top member.   *See, e.g.*, '637 Patent, Fig. 5. Because I must construe patent claims "with the meaning with which they are presented in the patent document," including to be "consistent with the specification," *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d at 1371, I cannot accept Defendants' proposed construction of the term "a single piece connector member."

Accordingly, I conclude that this description of the connector member as a "single piece" means a connector member that includes as a single unit all the component parts listed in Claim 15 concerning the connector member—the hollow body, the sidewalls that permit the passage of light therethrough, the first engaging means at the top of the hollow body, the second engaging means at the bottom of the hollow body. I reach this conclusion for reasons similar to those stated above with respect to Claims 1 and 13, finding that the claims and specification support the same construction in Claim 15. *See* '637 Patent Reexam. Cert., at Col. 2, lines 24-26 ("a single piece connector member . . . comprising: a hollow body with a top end [*sic*] a bottom end"); *id.* at Col. 2, lines 33-34 ("first engaging means provided at said top end of said hollow body"); *id.* at Col. 2, lines 35-36 ("second engaging means provided at said bottom end of said hollow body); *see also* '637 Patent, Col. 6, lines 39-53 ("[T]he connector member 90 . . . forms a lens for placement/mounting on the top of a post where the lens is also capable of supporting a light mounted thereon. Again, the connector member 90 contains downward extending tabs 22 . . . that are slidably received within the post cavity. . . . Additionally, . . . connector member 90 has a continuous upward-facing side wall 92 . . . which fits over the outside perimeter of the top member.").

Accordingly, I construe the terms "the connector member is a single piece" and "a single piece connector member" to both mean a connector member that includes as a single unit all the component parts listed in Claim 1 and Claim 15, respectively, concerning the connector member—a hollow body, sidewalls that permit the passage of light therethrough, a first engaging means at the top of the hollow body, and a second engaging means at the bottom of the hollow body.

### 6. "substantially transparent sidewalls"

The parties disagree over how to construe the term "substantially transparent sidewalls," found in Claim 16.    They propose the following constructions:

| Claim(s) | Term to Construe | LMT's Proposed Definition | Defendants' Proposed Definition |
|---|---|---|---|
| 16 | substantially transparent sidewalls | Plain and ordinary meaning. *Or* A wall of the hollow body that largely allows for the transmittal of light. | Transparent sidewalls with ridges across the width which would give the appearance of being nearly transparent.   A transparent or translucent pane of glass is not covered by this claim element. |

LMT's proposes that no construction is necessary and the plain and ordinary meaning of this claim term should apply.   In patent law, however, the Federal Circuit had repeatedly noted that the term "substantially" does not have a plain and ordinary meaning; rather, this term is largely defined by reference to the intrinsic evidence.   *Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1323 (Fed. Cir. 2003) ("Since the term 'substantially' is capable of multiple interpretations, we turn to the intrinsic evidence to determine which interpretation should be adopted."); *see also ICI Uniqema, Inc. v. Kobo Prods., Inc.*, Civ. No. 06-2943(JAP), 2009 WL 2496857, at *9 (D.N.J. Aug. 13, 2009) (construing the term "substantially transparent" in light of the specification).   Thus, I am obligated to construe the term "substantially transparent sidewalls" in light of the specification and other intrinsic evidence.

Defendants argue that "substantially transparent" limits the claim term to ridges covering the entire sidewalls, to the exclusion of transparent or translucent glass.   Defendants' first limitation is based on its argument that these sidewalls, as defined in Claim 15, comprise "light

diffusing means," which, as noted earlier, Defendants contend are either a "translucent panel or a transparent panel with ridges across the width thereof." *See* Def. *Markman* Br., 21-22; *see also supra*, Part III.C.1. Defendants then point out that the term "substantially transparent sidewalls" in Claim 16 is dependent on and modifies Claim 15, and argue that because "transparent" is different than "translucent," the only logical construction of "substantially transparent sidewalls" is transparent sidewalls with ridges across the width thereof.

I have rejected Defendants' argument that "light diffusing means" is limited only to the two constructions proposed by Defendants, *see supra* Part III.C.1., and that reasoning continues to apply with equal force. For that reason, I find it inappropriate to limit the term "substantially transparent sidewalls" only to transparent sidewalls with ridges extending the width thereof.

Turning to the specification, it is apparent that the terms "transparent," "substantially transparent" and "translucent" are often used somewhat interchangeably. This suggests, contrary to Defendants' argument, that "transparent" and "translucent" are not always meant to be mutually exclusive. *Cf. Edwards Lifesciences, LLC v. Cook, Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) (where the terms "graft" and "intraluminal graft" were used interchangeably in the specification, "[t]he interchangeable use of the two terms is akin to a definition equating the two"); *Wyeth v. Impax Labs., Inc.*, 526 F. Supp. 2d 474, 481 (D. Del. 2007) ("The interchangeable use of the terms 'level' and 'incidence' in the specification with respect to nausea, along with the inventors' failure to specifically equate the term 'incidences' with either percentages or numbers in the specification, leads the Court to believe that Wyeth's broader definition of the term 'diminished incidences of nausea and emesis' is correct.").

Further review reveals that the term "substantially transparent" is described in the context of a specific embodiment:

In another embodiment, a fence post assembly is provided comprising a substantially transparent connector member . . . the translucent connector member comprises two substantially parallel interface surfaces . . . . The transparent connector further comprises an interior and exterior sidewall . . . In this regard, the connector member forms a lens . . . The transparent connector member also comprises a diffusing means on the surface of at least one of the interior and exterior sidewalls. *This diffusing means may be any coating of physical variation on the sidewall surfaces which act to disperse light that may emanate from within the transparent connector member*.

'637 Patent, Col. 3, lines 29-51 (emphasis added); *see also id.*, Abstract ("[I]n one embodiment, the connector member is substantially transparent, such that the connector member forms a lens. . . ."). Figure 5 corresponds to this description, which I set forth on the following page, and explains that the "connector member 90 is substantially transparent":



FIG.5

*Id.*, Fig. 5.

48

In light of this description and drawing, I conclude that the term "substantially transparent sidewalls" in Claim 16 refers to an embodiment wherein the connector member sidewalls serve the additional purpose of entirely being the "light diffusing means" of the fence post apparatus. In other words, Claim 16 recites an embodiment of the fence post apparatus where the connector member and the light diffusing means are one in the same. This is contrasted to other possible embodiments where the connector member's sidewalls are not entirely comprised of a light diffusing means, *i.e.*, where the light diffusing means is a portion of the sidewalls. *See, e.g.*, *id.*, Fig. 4; *see also Phillips*, 415 F.3d. 1314 (noting that specification is "single best guide to meaning of a disputed term). In that regard, I find no basis to import the limitations suggested by Defendants of ridges extending the width of the sidewalls to be the only structure associated with the light diffusing means. *MBO Labs., Inc.*, 474 F.3d at 1333-34 ("Limiting claims from the specification is generally not permitted absent a clear disclosure that the patentee intended the claims to be limited as shown."). Accordingly, I construe the term "substantially transparent sidewalls" to mean sidewalls of the hollow body comprised entirely of a light diffusing means, as defined in this Opinion.

### 7. "at least one of a coating and a physical variation"

The parties disagree over how to construe the term "at least one of a coating and a physical variation," found in Claim 18. They propose the following constructions:

| Claim(s) | Term to Construe | LMT's Proposed Definition | Defendants' Proposed Definition |
|---|---|---|---|
| 18 | at least one of a coating and a physical variation | Plain and ordinary meaning. *Or* Having a coating, or having a physical variation, or having both a coating and a physical variation. | At least one coating *and* at least one physical variation. |

As can be seen, the parties' dispute over this claim term arises solely out of a question of grammar; neither party disputes that the specific terms require additional construction.

In essence, the parties disagree whether the syntax "at least one of . . . and . . ." means "one or more of," as LMT proposes, or means "having at least one of both," as Defendants propose. Given the structure of this claim term, the more commonly understood grammatical interpretation aligns with Defendants' proposed construct. In typical English prose, when a clause begins with the phrase "at least one of," and then is followed by a list of items separated by "and," the clause is normally read to mean at least one of *each* of the items in the list. *See SuperGuide Corp. v. DirecTV Enter., Inc.,* 358 F.3d 870, 885 (Fed. Cir. 2004) ("A common treatise on grammar teaches that 'an article of a preposition applying to all the members of the series must either be used only before the first term or else be repeated before each term.'" (Quoting William Strunk, Jr. & E.B. White, The Elements of Style 27 (4th ed. 2000)). Patent law, however, as noted elsewhere in this Opinion, often relies on idiosyncratic definitions of words or grammar different than typical English usage. *See, e.g.*, *Deering Precision Instr., L.L.C.*, 347 F.3d at 1323.

Indeed, at least one other court, in construing a claim term similar to the instant disputed term, has found that the standard English grammar usage of the phrase "at least one of . . . and" did not apply to the construction of the patent in that case. *See, e.g.*, *Joao v. Sleepy Hollow Bank*, 348 F. Supp. 2d. 120, 124-126 (S.D.N.Y. 2004) (construing "at least one of . . . and" to mean "at least one of . . . or" in light of the context of the patent claims and specification, and citing *SuperGuide Corp.*, *supra*, at 885-87); *see also id.* at 125 ("[I]t is perfectly proper to ignore English grammar and syntax when interpreting patent claim language—at least, when context renders a different reading more sensible."). Thus, although Defendants' proposed construction comports with the usual meaning of the claim term under English grammar, I review LMT's proposed construction to determine if it more accurately aligns with the patent claims and specification. *See SuperGuide Corp.,* 358 F.3d at 887 (presumption that patent drafters intended meaning other than plain and ordinary meaning of claim term may be disregarded if supported by specification (citing *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002)); *see also Phillips*, 415. F3d. at 1324.

Here, LMT bases its proposed construction on a portion of the specification describing that the "diffusing means may be any coating *or* physical variation on the sidewall surfaces which act to disperse light that may emanate from within the transparent connector member." *See* Pl. *Markman* Br., 29 (quoting '637 Patent, Col. 2, lines 47-50 (emphasis added)). According to LMT, this description, specifically the use of the word "or," requires the construction of the claim term "at least one of a coating and a physical variation" to mean "at least one of a coating *or* physical variation." I am not convinced. In *Joao v. Sleepy Hollow Bank*, the primary reason the court construed "at least one of . . . and" to mean "at least one of . . . or" was because the former construction would be nonsensical in the context of the patent at

issue. In this case, it is entirely plausible that the light diffusing means could be comprised of both a coating and a physical variation. For example, a person of ordinary skill in the art could read this claim term to mean that the light diffusing means is embodied in a structure that comprised both a light diffusing coating and a plurality of ridges; there is nothing in the patent to suggest that such a structure would not otherwise fall with the scope of the claims of the '637 Patent as I have construed them in this Opinion. Because I find no basis to disregard the standard English grammatical meaning of the phrase "at least one of . . . and," I construe the claim term "at least one of a coating and a physical variation" to mean at least one of a coating and at least one of a physical variation.

## IV.    CONCLUSION

For the foregoing reasons, the Court construes the disputed claim terms as follows:

| Claim(s) | Term to Construe | Court's Construction |
|---|---|---|
| 1, 11, 15 | light diffusing means for dispersing light emanating from within the hollow body | <u>Function</u>: dispersing light emanating from within the hollow body<br><br><u>Structure</u>: any coating or physical variation on the sidewall surfaces which acts to disperse light |
| 1, 11, 15 | axially slidably engaging | placement of the post cap on the post downwardly along the longitudinal axis of the post able to contact and slide along the axis of the fence post |
| 1, 11, 15 | dimensioned to provide resistance to removal | the post cap is dimensioned relative to the post onto which it fits such that in order to remove the post cap, the same or greater amount of force or pressure must be applied as was applied to securely engage the post cap onto the post |
| 11 | engaging means | the post cap is dimensioned relative to the post onto which it fits such that in order to remove the post cap, the same or greater amount of force or pressure must be applied as was applied to securely engage the post cap onto the post |

| | | |
|---|---|---|
| 1, 15 | first engaging means | <u>Function</u>: contacting the hollow body with the top member<br><br><u>Structure</u>: one or more tabs, sidewalls, walls, or their equivalents that extends across an interface plane between two structures and receives or is received within one of the structures |
| 1, 15 | second engaging means | <u>Function</u>: contacting the hollow body with the fence post<br><br><u>Structure</u>: one or more tabs, sidewalls, walls, or their equivalents that extends across an interface plane between two structures and receives or is received within one of the structures |
| 13 | the connector member is a single piece | a connector member that includes as a single unit all the component parts of a connector member listed in Claim 1: a hollow body, sidewalls that permit the passage of light therethrough, a first engaging means at the top of the hollow body, and a second engaging means at the bottom of the hollow body |
| 15 | a single piece connector member | a connector member that includes as a single unit all the component parts of a connector member listed in Claim 15: a hollow body, sidewalls that permit the passage of light therethrough, a first engaging means at the top of the hollow body, and a second engaging means at the bottom of the hollow body |
| 16 | substantially transparent sidewalls | sidewalls of the hollow body comprised entirely of a light diffusing means |
| 18 | at least one of a coating and a physical variation | at least one of a coating and at least one of a physical variation |

Dated:        January 16, 2014

/s/ Freda L. Wolfson
FREDA L. WOLFSON, U.S.D.J.
